**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Ohio Lending Consultants, LLC et al.,** | ) | **CASE NO. 1:14 CV 1358** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Securities Capital Holdings, Inc. et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

The matter is before the Court upon Defendants' Motion to Dismiss or, Alternatively, to Transfer Venue and Incorporated Memorandum of Law (Doc. 12).  This case arises from defendants' alleged diversion of profits from plaintiffs.  For the reasons set forth below, defendants' motion to dismiss is DENIED.

<u>**Facts**</u>

Plaintiffs, Ohio Lending Consultants, LLC ("Ohio Lending"), an Ohio limited liability company, and Kirk Doskocil ("Doskocil"), Ohio Lending's sole member, bring this suit against Securities Capital Holdings, Inc. ("Securities Capital"), a Florida corporation with its principal place of business in Orlando, Florida, Alex Fink ("Fink"), a Florida resident and one

1

of Securities Capital's primary shareholders who ran its daily operations, and Matthew

Brothers ("Brothers"), a Florida resident, alleging that defendants diverted more than six

million dollars in profits from plaintiffs.

Plaintiffs set forth the following facts in support of jurisdiction. Doskocil formerly

ran First Ohio Banc and Lending, Inc. ("First Ohio"), a mortgage banking business in

Independence, Ohio. Looking for new banking opportunities, a First Ohio employee initiated

contact with Fink and his company Securities Capital, who managed the office of Proficio

Mortgage Ventures, LLC ("PMV") in Orlando, Florida. PMV is a nationwide residential

mortgage lender that sells real estate loans to buyers like banks and investors on what is

termed the "Secondary Market" and operates through a series of branches throughout the

country. Pursuant to a Mortgage Fulfillment and Support Services Agreement ("Services

Agreement") with PMV, Securities Capital had agreed to provide a number of services to

PMV's branches, including IT training and maintenance, assisting with closing paperwork,

and recruiting individuals to open new PMV branches.

On November 11, 2011, Doskocil met with Securities Capital, Fink, and the president

of PMV in Florida to discuss establishing a relationship with PMV. After the meeting, Fink

contacted Doskocil numerous times by phone and email in Ohio. During these exchanges,

Doskocil asked for clarification of PMV's profit margins. Fink repeatedly represented that

PMV charged only 50 base points ("bps")[1] on conventional loans and 62.5 bps on Federal

Housing Association ("FHA") loans ("50/62.5 bps"), and that Doskocil was entitled to any

---

[1]     The markup for resale of a loan in the Secondary Market is described in basis
        points, which equals .01% of the unpaid principal balance on the loan ("bps").

2

additional markups on loans.  Fink confirmed that Securities Capital earned nothing on closings other than fixed costs allowed under the Services Agreement.

Based on these representations, First Ohio terminated its employees and PMV's Independence, Ohio branch immediately hired them.  Doskocil formed Ohio Lending and entered into an Affiliate Manager Agreement with PMV to manage the Independence, Ohio branch.

Under the Affiliate Manager Agreement, Ohio Lending agreed to be compensated by a "Group Margin," which would form part of the rate it charged to borrowers. Ohio Lending negotiated its Group Margin in reliance on the representations that PMV only charged 50/62.5 bps per transaction. The consumer rates Ohio Lending charged were prepared by Securities Capital on a daily basis for PMV's branches.  Securities Capital had agreed to provide the daily rate sheets as part of its Services Agreement with PMV.  Fink oversaw the operations of the rate software.  Brothers, once an employee of Fink and who at the time worked for PMV's Orlando, Florida branch, operated the software and distributed the loan pricing information daily to PMV's branches.  The software generated the daily rate sheet for different loans based on the price quoted by buyers in the Secondary Market, plus the Group Margin and the profit to PMV.  However, the rate sheet included the sum of these amounts and not a breakdown of the components.

Following the execution of the Affiliate Manager Agreement, plaintiffs noticed fluctuations in the daily rate sheets that did not reflect current interest rates.  Furthermore, the rates were higher than those offered by similar lenders.  Plaintiffs requested reconfirmation of the structure of Securities Capital's compensation and PMV's profits.  Securities Capital

3

indicated that it was not making any money off of Ohio Lending's closings.  Fink and Brothers continued to represent that PMV was only making profits of 50/62.5 bps on the loans.  Defendants represented that any interest rate issues resulted from pricing problems with buyers on the Secondary Market.  Plaintiffs relied on these representations and continued their relationship with PMV under the Affiliate Manager Agreement.

Subsequently, plaintiffs conferred with one of PMV's buyers, The Money Source, Inc. ("TMS") and learned that their rates were competitive and not drastically pushing up the rates in the daily rate sheet.  Plaintiffs concluded that the rates quoted on the daily rate sheet reflected that far more than the 50/62.5 bps, often two or three times this amount, was being added to the buyers' rates.  Plaintiffs thereafter learned that Securities Capital had a Division Manager Agreement with PMV, under which Securities Capital was entitled to "100% of the Monthly Division Profit" minus a fixed number of bps paid to PMV.  As such, any profits beyond the fixed amount due to PMV from loan transactions at its branches flowed to Securities Capital.

Securities Capital routinely reviewed both opened and unopened emails within PMV, including communications by the plaintiffs.  Several times Fink and Securities Capital destroyed email communications on the server, making the communications unavailable.

In mid-2013, PMV terminated the Division Manager Agreement and the Services Agreement with Securities Capital.  All told, from January 2012 through June 2013, defendants diverted more than $6,000,000 from Ohio Lending by increasing the rates on the daily rate sheet.

Plaintiffs thereafter brought suit.  The complaint contains eight claims for relief.

4

Count I is a claim for fraudulent inducement. Count II is a claim for fraud and misrepresentation.  Count III is a claim for promissory estoppel.  Count IV is a claim for tortious interference with contract.  Count V is a claim for unlawful access to stored communications and Count VI is a claim for interception and disclosure of electronic communications.  Count VII is a claim for civil conspiracy.  Count VIII is a claim for unjust enrichment.

This matter is before the Court upon defendants' motion to dismiss or transfer the case for lack of personal jurisdiction, which plaintiffs oppose.

**Standard of Review**

Presented with a motion to dismiss for lack of personal jurisdiction and opposition thereto, "a court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir. 1991).  The court has discretion to decide which method it will follow. *Id.*  However the court handles the motion, the plaintiff always bears the burden of establishing that jurisdiction exists. *Serras v. First Tennessee Bank National Ass'n,* 875 F.2d 1212, 1214 (6th Cir. 1989).  If the defendant supports his motion to dismiss with affidavits, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction. *Theunissen,* 935 F.2d at 1458 (citing *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 930 (6th Cir. 1974).

In the absence of an evidentiary hearing, the court must view the pleadings and affidavits in the light most favorable to the plaintiff and not consider the controverting

5

assertions of defendant. *Calphalon Corp. v. Rowlette,* 228 F.3d 718, 721–22 (6th Cir. 2000). Thus, the plaintiff's burden is only that of making a prima facie showing that personal jurisdiction exists in order to defeat dismissal. *Id. See also Bird v. Parsons,* 289 F.3d 865, 871 (6th Cir.2002) ("When the district court dismisses a complaint pursuant to Rule 12(b)(2) without conducting an evidentiary hearing on the issue of personal jurisdiction ... the plaintiff need only make a *prima facie* showing of jurisdiction ... [and the court] will not consider facts proffered by the defendant that conflict with those offered by the plaintiff[.]"). This burden is "relatively slight." *Am. Greetings Corp. v. Cohn,* 839 F.2d 1164, 1169 (6th Cir. 1988). A prima facie showing is made by "establishing with reasonable particularity sufficient contacts between [defendant] and the forum state to support jurisdiction." *Neogen Corporation v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir.2002) (internal citations omitted). Under this standard, dismissal is "proper only if *all* the specific facts which the plaintiff ... alleges collectively fail to state a *prima facie* case for jurisdiction." *Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147, 149 (6th Cir.1997) (quoting *Theunissen,* 935 F.2d at 1458) (emphasis added by *Kerry Steel* court).

 "In a diversity case, a federal court can exercise personal jurisdiction over a defendant if jurisdiction is (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Tharo Systems, Inc. v. Cab Produkttechnik GMBH & Co. KG,* 196 Fed. Appx. 366 (6th Cir. 2006) (internal quotations and citations omitted). Because Ohio's long-arm statute does not extend to the constitutional limits of due process, the Court looks to whether the defendants are amenable to suit under Ohio's long-arm statute and whether due process requirements of the Constitution are met.

6

*Estate of Dorothy Thomson v. Toyota Motor Corp.,* 545 F.3d 357 (6th Cir. 2008).

**Discussion**

**I. Defendants' Motion to Dismiss**

Defendants seek to dismiss the complaint, arguing that they lack the minimum contacts with Ohio required to support personal jurisdiction.

**A. Ohio's Long-Arm Statute**

A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;
(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state;

Ohio Rev. Code § 2307.382(A).

After review, the Court finds that plaintiffs have established a prima facie case for personal jurisdiction under the long-arm statute over each defendant.

**Securities Capital and Fink**

Plaintiffs present evidence that Securities Capital was a party to a Division Manager Agreement with PMV.  (Doc. 15-3).  Under the agreement, Securities Capital agreed to be "responsible for the hiring and firing of Division personnel, the management of expenses, and the development of Division policies and procedures." (Doc. 15-3 p. 1).  The division managed by Securities Capital and Fink was comprised of all of PMV's branches throughout the country (Comp. ¶ 35).  This includes the Ohio branch managed by Ohio Lending. Securities Capital and Fink had also agreed to provide numerous ongoing services to PMV's branches pursuant to the Services Agreement. (Doc. 15-2).  And after Ohio Lending had

7

become a PMV affiliate, Securities Capital and Fink regularly communicated with Ohio

Lending and Doskocil. (Comp. ¶ 69, 71).

Section (A)(1) of the Ohio long-arm statute is "very broadly worded and permit[s]

jurisdiction over nonresident defendants who are transacting any business in Ohio." *Genesis*

*Insurance Co. v. Alfi,* 425 F. Supp. 2d 876, 894 (S.D. Ohio 2006) (citing *Kentucky Oaks Mall*

*Co. v. Mitchell's Formal Wear, Inc.,* 53 Ohio St.3d 73, 559 N.E.2d 477 (1990), *cert.*

*denied,*499 U.S. 975, 111 S.Ct. 1619, 113 L.Ed.2d 717 (1991)).  For jurisdiction to be proper,

the cause of action must "arise" out of the business being transacted in Ohio. *See* Ohio

Rev.Code § 2307.382(c).  Although Securities Capital contracted with PMV, a Florida

corporation, the Court finds that it did "transact business" in Ohio.  Securities Capital and

Fink entered into continuing obligations in Ohio when they agreed to manage a division that

encompassed branches in Ohio and to provide services to these branches on an ongoing basis.

Defendants' reliance on this Court's decision in *Kaczmarek v. Res-Care, Inc.* to defeat

jurisdiction is unpersuasive. 2013 WL 6276088 (N.D. Ohio Dec. 4, 2013).  In that case, the

defendant provided HR services in Ohio.  *Id*. at *2.  However the defendant was accused of

sexually harassing the plaintiff in Texas.  The Court concluded that defendant's harassment of

plaintiff did not arise out of his role as HR supervisor and, while the defendant may have

transacted business in Ohio, the transactions were unrelated to the plaintiff's wrongful

termination claims. *Id*. at *2.  That is not the case here.

Securities Capital and Fink are alleged to have been engaged in an ongoing

relationship with Ohio Lending and Doskocil by virtue of the Division Manager Agreement

and the Services Agreement with PMV.  It was pursuant to the Services Agreement that

8

Securities Capital and Fink had agreed to provide the IT services and daily rate sheets to PMV branches, like the one managed by Ohio Lending.  And it was through these rate sheets that defendants allegedly diverted profits that should have come to plaintiffs.  Additionally, it is through the provision of IT services that plaintiffs allege Securities Capital and Fink improperly accessed plaintiffs' stored email communications.  Consequently, the Court finds that plaintiffs have made out a prima facie case that their causes of action arise from Securities Capital and Fink "transacting business" in Ohio.

Even if there were no jurisdiction over Securities Capital and Fink under Section (A)(1) of the Ohio long-arm statute, the Court concludes that plaintiffs have established a prima facie case for personal jurisdiction under (A)(6) as well.  O.R.C. § 2307.382(A)(6) authorizes courts to exercise personal jurisdiction over non-resident defendants who commit tortious acts outside Ohio where the defendants might reasonably expect that someone in Ohio would be injured.  Plaintiffs have established that Fink and Securities Capital knew plaintiffs were Ohio residents. (Doc. 15-1 ¶ 10).  They allege that, acting from Florida, Securities Capital and Fink made repeated representations regarding the rate sheets and that Securities Capital was not making any money off of the loans closed by Ohio Lending. (Comp. ¶ 69).  It is also alleged that defendants opened and destroyed plaintiffs' emails while acting from Florida.  Plaintiffs have sufficiently established that defendants' alleged fraud and unlawful access to stored communications injured plaintiffs in Ohio and that defendants might reasonably have expected them to be injured in Ohio by their tortious acts.  Consequently, O.R.C. § 2307.382(A)(6) also confers personal jurisdiction over Securities Capital and Fink.

**Brothers**

9

Plaintiffs, in their pleadings and by affidavit, state that Brothers was responsible for creating the daily rate sheets which they allege defendants manipulated to divert profits to Securities Capital. (Comp. ¶ 63).  They also allege that Brothers communicated frequently with Doskocil in Ohio about the rate sheets.  Brothers repeatedly represented that the only additional margin on the loans was 50/62.5 bps going to PMV and blamed pricing issues on buyers in the Secondary Market. (Comp.  ¶ 70, 72).  Fraudulent communications or misrepresentations directed at Ohio residents satisfy § 2307.382(A)(6)'s requirements. *Schneider v. Hardesty,* 669 F.3d 693, 700 (6th Cir. 2012) (finding attorney's drafting of letters forwarded to plaintiffs by attorney's client supported exercising personal jurisdiction over attorney).   Plaintiffs have alleged that Brothers, acting outside of Ohio, directed fraudulent communications to Ohio residents to conceal Securities Capital's profits.  Consequently, the Court finds that plaintiffs have set forth a prima facie case for personal jurisdiction under O.R.C. § 2307.382(A)(6) against Brothers.

### B. Due Process Jurisdiction

Having found that personal jurisdiction exists under Ohio's long-arm statute, the Court now turns to whether exercising personal jurisdiction over defendants comports with the Due Process Clause.

Due process requires that a defendant have "minimum contacts . . . with the forum State  . . . such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).  The presence of such contacts ensures that the exercise of jurisdiction over the defendant "does not offend 'traditional notions of fair play and substantial justice.' " *Int'l*

10

*Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting

*Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).  The Court

employs three criteria to make this determination:

> (1) the defendant must purposefully avail itself of the privilege of acting in the forum state or causing a consequence in the forum state;
> (2) the cause of action must arise from the defendant's activities there; and
> (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Indus., Inc.,* 401 F.2d 374 (6th Cir. 1968).

After considering these criteria, the Court concludes that exercising jurisdiction over

defendants also comports with due process.

The purposeful availment requirement "ensures that a defendant will not be haled into

a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts." *Burger*

*King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).  "[P]urposeful

availment may exist when a defendant makes telephone calls and sends facsimiles into the

forum state and such communications 'form the bases for the action.'" *Intera Corp. v.*

*Henderson,* 428 F.3d 605, 616 (6th Cir. 2005) (quoting *Neal v. Janssen,* 270 F.3d 328, 332

(6th Cir. 2001)).

Here, the heart of plaintiffs' claims arise from Securities Capital, Fink, and Brothers's

repeated representations to plaintiffs in Ohio that Securities Capital was not making any profit

off of Ohio Lending's closings and that the only markup on the daily rate sheets was the

50/62.5 bps going to PMV.  Plaintiffs plead that they relied upon these representations in

continuing their relationship with PMV.  The Court is unpersuaded by defendants' arguments

that these contacts with Ohio are random and fortuitous.  Defendants repeatedly contacted

plaintiffs in Ohio and are alleged to have diverted profits from Ohio Lending's operations of

PMV's Independence, Ohio branch to themselves.  Plaintiffs have sufficiently established that

Securities Capital, Fink, and Brothers purposefully availed themselves of the benefits and

burdens of Ohio to satisfy the requirements of due process.  *Am. Greetings Corp. v. Cohn,*

839 F.2d 1164, 1170 (6th Cir. 1988) (holding threatening letters and phone calls to plaintiff in

Ohio satisfied due process).

Secondly, the Court looks to whether plaintiffs' cause of action arise from the

defendant's contacts with the state.  This requirement is subject to a "lenient standard," which

plaintiffs have met.  As previously discussed, the claims in this case arise from Securities

Capital, Fink, and Brothers's repeated representation about the profit structure at work in the

daily rate sheets.  Those communications made by defendants to plaintiffs in Ohio, the

transmission of the daily rate sheets to plaintiffs in Ohio, and defendants' alleged access to

plaintiffs' email, underlie plaintiffs' claims against defendants.  Consequently, the second due

process criteria is present.

The final criteria is whether the defendants have a sufficiently substantial connection

to Ohio that the exercise of jurisdiction is not unreasonable.  "[W]here, as here, the first two

criter[ia] are met, 'an inference of reasonableness arises' and 'only the unusual case will not

meet [the substantial connection] criteri[on].' " *Air Prods. & Controls, Inc.,* 503 F.3d at 554

(quoting *Theunissen v. Matthews,* 935 F.2d 1454, 1461 (6th Cir. 1991)). "In determining

whether the exercise of jurisdiction is reasonable, the court should consider, among others,

the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3)

the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most

efficient resolution of the policy." *Id.* at 554–55.

Defending this case in Ohio certainly creates a burden for defendants, however the Court does not find this to be an "unusual case" that should defeat the inference of reasonableness.  Ohio has an interest in ensuring its residents are protected from non-residents.  Defendants' other proffered considerations—Florida's interest in its own citizens, the fact that plaintiffs initiated contact with PMV through defendants, and the presence of witnesses in Florida—do not overcome the inference of reasonableness.  Accordingly, the Court finds that plaintiffs have made out a prima facie case that exercising personal jurisdiction over Securities Capital, Fink, and Brothers comports with due process.

Having found that plaintiffs have made out a prima facie case for personal jurisdiction under Ohio's long-arm statute and that the exercise of jurisdiction accords with due process, defendants' motion to dismiss the case is denied.

## II. Transfer of Venue

Defendants alternatively move the Court to transfer this case to the Middle District of Florida.  They contend that transfer under 28 U.S.C. § 1404(a) is warranted because the key events of this case occurred in Florida and the location of defendants, the physical evidence, and key witnesses within that district weigh in favor of transfer.

Analysis under Section 1404(a) involves a two-step process.  First, defendant's proposed alternative forum must be a district "where [the action] might have been brought." 28 U.S.C. § 1404(a).  Second, the court must "consider[] the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric

of 'interests of justice.'" *Moses v. Business Card Express, Inc.,* 929 F.2d 1131, 1137 (6th Cir. 1991).  The party seeking transfer has the burden to prove that the balance of convenience is strongly in favor of transfer. *Jamhour v. Scottsdale Ins. Co.,* 211 F. Supp. 2d 941, 947 (S.D. Ohio 2002).  The decision whether to transfer venue is relegated to the discretion of the trial court. *Midwest Motor Supply Co., Inc. v. Kimball,* 761 F. Supp. 1316, 1317 (S.D. Ohio 1991).

After review, the Court denies defendants' motion to transfer.  Plaintiffs are Ohio citizens, seeking vindication for a wrong they have sufficiently alleged occurred in this judicial district.  Their choice of forum is entitled to substantial weight.  While defendants are in Florida, plaintiffs are in Ohio.  Both parties have identified witnesses scattered throughout the country as well as in the judicial districts where they seek to have this case proceed.  And the documentary evidence in this case is in both Ohio and Florida.  After weighing the relevant factors, defendants have failed to meet their burden of demonstrating that the balance of conveniences weigh strongly in favor of transfer and defendants' motion on this point is denied.

### Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss or, Alternatively, to Transfer Venue and Incorporated Memorandum of Law (Doc. 12) is DENIED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 10/14/14

14